It is a basic tenet in NEPA law that the existence of a viable yet unexamined alternative will render an EIS inadequate. It is an equally foundational principle that agencies need only examine a reasonable range of alternatives. The issue before the Court today is whether the proposed alternative submitted by the Plaintiff Group's SEACC, whether this alternative was a viable yet unexamined alternative, or was it just one of a myriad of ways that falls within the spectrum of alternatives examined by the agencies. Well, let me focus a little more precisely. Are you saying that what SEACC says is the alternative that was not examined was examined, or are you saying that it was one of something that was sort of so ephemeral that it didn't have to be examined? Your Honor, and I can answer both. All of the components of the SEACC, of the alternative proposed by SEACC, were examined by the agencies. And Could one of you find that in the no action portion? If you look at each of the specific components, let's take the What do you mean by components? Because we're talking about Yes, I'll give you an example. Well, this is the improvements that we're talking about, is improvements to a transportation system. There are many moving parts here. This is the ferries. So the component that I'm speaking of, the one where the SEACC alternative gets its greatest capacity, is using the main line of ferries after their decommissioning date. That component, which is really the cornerstone of the proposal, that was examined. It was proposed in the draft EIS. This isn't a new proposal. It was actually tested in 1997 and 1998, and this is in Appendix A to the EIS, is the alternatives report of all the alternatives examined. It was run in 97, 98. In 1999, the alternatives analysis examined that and determined that for the marginal increase in service, it was not cost effective. It was much too expensive to operate, primarily because of the two crews that it requires. That was found in the EIS in Chapter 2, the discussion in the EIS of the alternatives. The second component to increased capacity is the taking service from, the fast ferry service from the community of Sitka, and moving that service into Lynn Canal. That type of alternative, the taking service from another, to the detriment, taking service to the detriment of another community, was also considered by the agencies. And the agencies set it as a ground rule. That was not a reasonable alternative that was to be considered in the, in this EIS analysis. I got the impression, at least from some of the materials, that it wasn't either or. In other words, it would perhaps reduce service in some way. What is happening here is, there is redeployment of ferries. The balancing of AMHS assets happens as part of a functioning system. You have ships break down and the assets are, and ships are moved around within the system. The no action alternative is a snapshot that is taken in 2005. AMHS assets, or AMHS efficiencies, the AMHS system, at that time. That recognizes this rebalancing. What AMHS doesn't do, didn't do in 2005, doesn't do now, and is not considered in the EIS, is remove ferry service from one community to stack it onto another. That's, that's, was never considered reasonable and remains. And that is unreasonable because? Because it would deprive the system. You see, that's the, it isn't, it's stated, if I understand what you're saying and what I understood from the case, that you're saying that it was, it was kind of stated as a given that we're not going to shift service from one place in order to provide more service to Haines or wherever it is we're trying to provide more service to. And as Chapter 1 of the EIS explains, the, the ferry, AMHS ferries are running at 24 hours a day, 7 days a week, except when they're in layup or maintenance. And the new fast ferries, the two fast ferries, those run on 12 hour schedules because that's what they're buying for. But the system operates to its maximum capacity at all times. The system also, Chapter 1 of EIS, explains the interplay between the Lynn Canal Corridor and the rest, the other 27 ports of the, of the AMHS system. And so this, to, to pull, if you think of a ferry as a bridge replacement, to improve the bridge to one community, it is, it is not, it is not a reasonable alternative to pull the bridge from another. It is not, and here with the, it's not a transportation system management measure to deprive another community. Well, I guess I'm, I, I, I'm, I guess I'm not understanding, I mean, I can understand as a policy matter that, that you may not want to, political matter, you may not want to take, you know, take away, diminish service to one area. But as a, an environmental question of, of, of, if you're going to improve service to one area, you seem to be saying, but we're not going to consider diminishing the service of the other in order to accomplish that. And I don't understand as a matter of environmental law or the general principle that you consider all alternatives, that, that you can, you can do that, because that's what's troubling. Yeah, if I may, just the geography, at least Alaska, we cannot isolate communities. So, so this is the, and Chapter 1 explains how the ferry system, how the ferry system is balanced within the community, that it operates full time. There is no excess capacity to pull from other communities. All the communities need access. But there's consideration given of increasing capacity. I mean, one of the things I went through here, and, and it struck me, is that there certainly is an argument with regard to how many round trips you can get out of the capacity. And that, I don't begin to understand how those calculations are made. But the one thing that did strike me is that these other I didn't see anything that explored the possibility, okay, if you can't rob Peter to pay Paul and take it from Sitka, is there something you can do to increase the capacity, so without building roads and increasing the number of ferry terminals, you can, by increasing the ferry capacity, solve this problem, or at least identify that as an alternative? The ferries are, are a set size, and they run, because of the distances they're running, they can only run within. They're a set size, but they're not, too. You can buy other ferries. The state has. And, and, and, John, that's exactly where, if you look at the spectrum, and the, the, the greatest visual aid I have for looking at the spectrum of alternatives is table 223. I reprinted it on page 21 of the brief. I've got a tap. I'd look at it a lot. What the agencies have done here, if you look at the spectrum of proposals, you have alternative one was the no action alternative. This is the snapshot of 2005, the agency operations. The, the next step up is buying new ferries. You have no roads, no new terminals, is alternatives 4C and 4A. If you look at the, just that first line, you double capacity with new ferries. You have the, really, the least impact that you can have. You look down at the bottom, in the last line, the 30 year life cycle cost, you've bumped this up about 50 million dollars. Double capacity with 50 million dollars. But we, and if I can explain just the rest of the spectrum, the, the alternatives 4B and 4D is building a five mile road to the nearest deep water port. It actually cuts off in a round trip 50 miles because it is five mile extension to existing roads. Alternative three is, it's over, just over 35 mile road with new ferries and then 2B, a 50 mile road. That is our spectrum. If you look at the, the 30 year life cycle cost, they, these bump up about, the first jump is the biggest, 50 million dollars over 30 year time. They, then they go up at 15, 20 million dollar increments from there, not necessarily correlating with the, the increased capacity. But what we, what we do know is the proposal to run the main liners as shuttle ferries increases cost. Just the reconditioning of the vessel, changing it from a, from a main liner vessel to a shuttle ferry costs 40% of the price of a, of building a new ferry. That only runs it out to its decommissioning date. There are still costs beyond that. We also know that it runs two crews. So we do have an increased cost, which puts you, and using the previous numbers, you actually have an increased capacity. With that increased cost and increased capacity, it puts you right near alternative one. You're at really alternative one and a half. But the agencies, when you have a spectrum, we, there are thousands of ways that the agencies could have looked at this. Instead of a five mile road, it could have been a three mile road. Instead of two ferries, one ferry. We, instead of two, they could have built three. But the agencies have to pick points, representative points on the spectrum. That's what NEPA requires, is that they decide a reasonable range and the public is able to, and the agencies are able to then look at this range and actually have an intelligent, informed conversation within the range. See our proposal, each of the components were studied and they fall within the range. And your honors, I'm sorry, but I'd like to reserve my remaining time for rebuttal. Thank you. Good morning. May it please the court, my name is Kate Glover and with me at council table is my colleague Eric Jordanson. We're here representing the Southeast Alaska Conservation Council and the other plaintiffs' appellees. As council for the state has stated, there are, in fact, there are thousands of ways that the state could have looked at improving ferry service on one canal. But the one thing they didn't do is look at improving service using existing boats and existing ferry facilities. And because they didn't do that, they've created an environmental impact statement that creates a false choice between, on the one hand, reduced service that the state's project manager called not very good service, and on the other hand, alternatives that require substantial construction and therefore have significant cost, both economically and environmentally. I hear council's presentation to suggest the contrary, that if you look at chapter two of the EIS on alternatives and also some references in chapter one, and what he said today, is specifically considered, in effect, taking service from Sitka and determined that that was not a viable choice. What more needs to be done here? Well, your honor, I think what really, what chapter one looks at is what the ferry system has looked like in the past. It doesn't look at what does the ferry service look like right now today and what could we do with what we have to try to do a better job providing service to and from Juneau. And so that doesn't serve the purposes of NEPA. What the agency's obligation is, is to consider in an environmental impact statement what they've got and look for different alternatives to improve that so that the agencies and the public can make an informed decision comparing the costs and benefits of the different alternatives. But how can you say a ferry service which is serving other parts of southeast constitute available resources, which is all that NEPA requires? Well, there's, I think there's two responses to that. First, I'll address the question of available resources. The provision that the state has relied on, which is section 42 U.S.C. 4332E, doesn't restrict the consideration of alternatives in the way the state has argued. And, in fact, the state hasn't been able to cite to a single case where the court interprets it that way. Subsection E, as this court held in Bob Varshall, Alliance v. Hovell, which is cited on page 28 of Plaintiff's brief, interprets that obligation to expand the obligation to consider alternatives so that when an agency doesn't have to complete an environmental impact statement, it still has to consider alternatives. So any time it's considering or proposing an action using, where there's conflicts over resources, they have to consider alternatives. But the second point I would make is that if the state's interpretation were correct, the only alternative they would have to consider here is one that uses existing boats. The other two alternatives all rely on funding that the state doesn't have and boats and roads that haven't even been built. And the court has regularly required agencies to consider alternatives that even would involve things beyond that agency's jurisdiction or that might require legislative authorization, legislative changes. But the second and I think the more important point is with respect to the question of the justification that using the existing boats to improve service would reduce service elsewhere. The state has argued either that that's a reasonable assumption or has argued that the information plaintiffs have relied on is outdated. But the fact is that in both the environmental impact statement and the record of decision, it's very clear that the other alternatives the agencies did consider would also have the potential to reduce service elsewhere. And first I would point the court to pages 494 and 513 of the excerpts of record. On those pages where the agencies are looking at alternatives requiring the construction of new ferry boats, the agencies state, these alternatives would place an additional funding burden on AMHS, and that's the ferry system, which could have negative impacts on other AMHS service. But the agencies still considered these alternatives in the environmental impact statement. So if it was reasonable to consider these four alternatives. I think he's being very different to say that there are economic ripples on one hand to say that we're taking the boat away from Sitka on the other. There is a very direct absence of service to Sitka if the boat is not used for the trips that otherwise are scheduled there. Your Honor, I think it's important to note that we're not talking about cutting off a bridge and moving it somewhere else. What we're talking about here is there's a variety of ways that you could look at improving service with existing boats. One might be taking boats that are currently operating south of Blinn Canal and extending the trip to also provide better servicing to Juneau. Or it might mean running boats more frequently at Blinn Canal. So it might mean that you take away service once a week from another community. But it doesn't mean that you completely deprive another community of the ability to get anywhere at all. It might also mean, as I believe Judge Clifton pointed out, maybe there's ways to increase service by, for example, looking at whether there's a large increased capacity, by looking at whether there's a larger boat that's serving another community that could instead be swapped for a boat that's in Blinn Canal right now. Now, the district court said that the state didn't look at these alternatives, I gather, in the way that it should have looked at them. Is that correct? That's correct. Now, in the EIS, can you point me, because there was no analysis of it, there was kind of a summary, as I understand what the district court was faulting the state court was, that there was kind of a summary rejection? Is that? Yes. Can you show me in the, can you tell me in the EIS where the inadequate analysis is? I believe what you're referring to is where the district court was pointing to the description of the no-action alternative. Yeah. And that's in both the environmental impact statement and the record of decision. I think the page that you're looking for is page 251 of the excerpt of record, where the agencies state that reassigning vessels to Blinn Canal could be reviewed as a form of transportation system management, but because it would be at the expense of service elsewhere, it is not considered. And that's the only reason given for it not being considered? That's the only reason that's given right there. Are we going to vote? Not when all of the other alternatives that were considered have that effect. And that's Why should that follow? We're not sitting here to decide what's the best solution to this problem for the state of Alaska. Our job is to determine whether the environmental impact statement was completed sufficiently to comply with federal statutes and regs. And it seems to me all they need to do is to consider, which it seems to me they did. It never took, the agencies never in the environmental impact statement or in the marine studies that the state refers to, never actually looked at what was available to the system and whether there were ways to use it to improve service in Blinn Canal. Then where did Mr. Lynch go wrong in what he stated to us a few minutes ago? It seems to me that's exactly what was going on. I think what you're referring to is his statement regarding the summaries in the environmental impact statement of what has happened in the past in Blinn Canal. But additional boats have been added to, I mean within the ferry system. Wasn't there some analysis going on in all of that? The portion of the environmental impact statement in chapters 1 and 2 describes the history of the ferry system. It talks about the state getting its first boats in the 1960s and adding boats to the system over time. So those changes reflect that, I mean if the agencies had taken a snapshot of service 10 years ago when they started the environmental impact statement and when they first did their marine studies, well then they wouldn't even be looking at the boats that they've got today and so the options they have now are not available. They're not things that could be done. It doesn't look at past plans, it doesn't look at other things. So what the environmental impact statement does is just gives you a history of what has happened with the ferry service system since it started. But there's no way that the agencies actually lay out what are the boats that we have today at the time we're making the decision, where are they serving in Southeast Alaska and where could we put them? What could we do with Blinn Canal to provide more service? Well and when he talks about the testing they did in 1997 and 1998, why isn't that responsive to your point? If you look at the page that he cited in there, and I apologize I don't have the page in front of me right now, but that's actually talking about an alternative, something else that was suggested entirely. On that page I think it's referring to the Nalaspina and a suggestion to build two ferry terminals, one in Bermers Bay and one at the Katsahine. Nalaspina is the name of the ferry? It's the name of the ferry, I apologize. So the proposal is to actually build two ferry terminals and use that boat as a shuttle between the two of them. That's something that agencies decided wasn't reasonable, but it's not the same thing as looking at whether you could run that boat or some other boat as a shuttle between the terminal that already exists in Juneau and those in Haynes and Skagway. So it's entirely different. Moreover, I'd say that the decision the agency is making today is a question of whether they need to build new roads, new boats, or keep on using the existing boats. But they haven't described an alternative that works at improving service. And so there's no way to compare an alternative that does a better job, provides better service, increased capacity and flexibility, but doesn't have the significant environmental effects or costs of the alternatives that were considered. I now work for the government. I've come to know up hand how inefficient government can be. So I accept the proposition there's some room to squeeze out of existing resources additional capacity. But I have to say it's hard for me to believe you can really squeeze out the additional capacity that your brief has discussed just by using existing resources without the Rob Peter to pay Paul factor. And I am troubled by the notion of, well, we can, for the time being, disregard CFCA or send them a vote once a week. They'll just have to make due and take the resources without having to factor that into consideration somehow. And politically, it's probably impossible. I don't know Alaska politics, but I know in my island state, if you decide to take capacity away from one island, you're going to hear about it for a long, long time. So why is that defined as a realistic alternative to produce sufficient capacity increase? And why should we assume there's that much capacity to squeeze out just by redeploying the existing resources? Well, first of all, there's nowhere in either the EIS or in the state's arguments that suggests that improving service, that using existing votes couldn't meet the purposes of the project, which is, I think, what you're getting at. They haven't argued that you can't. And there's the alternative that CF proposed as just an example of the type. Let me stop you there, because that may be what's driving this. And yet the state does argue that what they define as no action, which doesn't perhaps squeeze out the efficiency, winds up coming up with, I think the number's like 14 percent of what they project to be the demand come some future year. And if you look at the chart that they have pointed us to and that I've been looking at from time to time, it is clear that the no action alternative doesn't produce the capacity that all of the other alternatives produce. Your efficient use of existing resources alternative isn't defined in quite the same way, but in some place in your brief, you talk about being able to produce something like I mean, I don't hear anything that suggests you're going to get anything like the kind of capacity increase that the state argues you get through the alternative it shows. And the state argues that the alternative it shows is aimed at achieving the capacity demand, which they project for the year 20, whatever it is in the future. So you have to put the pieces together, but in fact, I think I do hear the state arguing that it's considered this alternative and it simply doesn't produce enough capacity to meet the demand that they project. Well, first, it's not the case that you have cars sitting in the parking lot of the ferry terminal just waiting to go. The demand numbers that are used in the environmental impact statement are just estimates based on the state's prediction of who might want to travel if someone built a road all the way through. So these are not numbers of, it's not the case that you have overcapacity on a highway. It's just a guess as to how many people would ideally like to travel. But the other point is that the no action alternative that you've referred to is, as it states very clearly in both the environmental impact statement and record of decision, a reduced capacity alternative. That's not even the level of capacity that we have today on the ferry service and wind canal. It's worse. For reasons that are predefined, in particular the decommissioning of, I think it's the two vessels that have reached what was previously defined as their useful life. I don't see that as being contrived. I mean, if it appears to be a fact of life, vessels do have useful lives. You may want to keep running them forever, but there are limits. And so how do we assume that out of existence? How do we not say that, look, they've decided years ago that the useful life is going to end here. That's why I start talking in terms about additional capacity, acquiring new ferries and so forth. And the state argues that, in fact, they did look at that alternative and points toward alternatives, I think it was 4A and 4C. Those alternatives, 4A and 4C, still require building new boats. They're not alternatives that don't require construction. That's not my point. I mean, if ships enter the useful life, aren't they going to have to build new boats? Aren't they going to have to build a new boat or acquire additional capacity if they're not going to rob Sitka in order to feed Juno? Isn't that a fair analysis of the alternatives that are realistic? I think the point is that because the state and the agencies didn't try to improve service with existing boats, we really don't know what level of capacity we can meet. If I understand what is said, it says reassigning vessels to Lynn Canal could be reviewed, but unlike more typical TSM measures, this would be at the expense of service elsewhere. For this reason, there is no alternative in the supplemental draft EIS that would study reassigning vessels. And isn't that what the district court faulted here that they just asserted that it would take them away without studying the effect of it? That's correct. And with respect to that, I'd like to very quickly point the state to some statements in the EIS and the record of decision that basically acknowledge that building a road will also deprive other communities of service. At page 412 of the excerpts of record, the EIS shows that the preferred road alternative would reduce revenues by 30% from the action alternative as well as increase costs substantially. Now in the record of decision at pages 113 and 114 of the excerpts of record, it very clearly states that the annual operating costs after revenues are taken into account for the preferred alternative would be more than a million dollars over the cost for no action. Far over time. I'm sorry. Thank you. Thank you. Thank you. May I first? I just need to make a clarification. I believe it was Justice Clifton. Justice Clifton, you had stated taking service from Sitka was analyzed in the EIS and actually taking service from Sitka or the detrimental, not only detrimental redeployments was a limitation in the EIS. It was actually the record of decision because the proposal came after the final EIS. So it was in the record of decision where there's a finding that taking vessels from Sitka was not reasonable. Just a quick clarification. Because? Because the AMHS provides service to the entire southeast and the vessels operate at capacity. And that's which is citing the record of decision. There was a suggestion that maybe if we had two snapshots, but in this case because it expanded over 14 years, we do have two snapshots. The draft EIS was a snapshot of 1996. The comments that are primarily in the plaintiff's briefs and that are cited at the district court level, those are comments on the alternatives in the draft EIS. There was those comments that spurred the agencies to look for these efficiency improvements, these optimization measures. So the 2006, 2005 snapshot is a far different snapshot than the one a decade before. If you look at the EIS includes all of the responses to the comments and in the record of decision you have like EPA's comments are in the record of decision. The concerns from 1996, the concerns are no longer spoken. The agencies did look, did exactly what both commenters and other commenting agencies asked them to look at and it is incorporated in the 2006 or 2005 snapshot. Counsel, what's your response to opposing counsel's response to your point that the references in Chapter 1 and Chapter 2 are just mere history. They're not part of this in that analytical process that you're supposed to be going through. So the EIS serves the purpose of explaining the system. So it does lay out a history, but it also gives the snapshot. So it does both and which is the purpose of the EIS to have informed discussions, informed decisions. So yes, the history is laid out, but it states at present time they're operating 24 hours a day with the exception of at that time the new fast ferry that's designed for 12. Well, where in the EIS, maybe it's in the no action alternative, but where in the EIS is there a recital that yes, you considered the possibility of moving the ferries around or changing schedules or whatever. In other words, the point your opposing counsel is making. Where would that be, even if it's cursorily discussed? And since the EIS is a snapshot and it explains what's going on, this is the movement of the vessels as they are at that date and through the history is recognized in the no action alternative. So the improved service that you see, the more frequent round trips, that is part of the redeployment and shuffling of vessels. In other words, that's where it was considered and rejected? Oh no, in the EIS itself, if you look at the next paragraph down where in the description of the no action alternative, and I think this is page 251, when it says the detrimental redeployment will not be considered, the next paragraph down says AMHS will continue to deploy different vessels including new vessels added to the system. This is still examined all the time. This is the no action alternative is fluid because it's a ferry system and things change. But it is a snapshot of that fluid system. Thank you. Thank you. The matter just argued is submitted for decision and we'll hear the next case on the calendar which is Probert versus Family Centered Services of Alaska. There's a lot of stuff here. Thank you.
judges: Schroeder, O'scannlain, Clifton